HARE & CHASE, INC., Appellant v. BANKERS' DISCOUNT CORP., Appellee, and ROYAL INDEMNITY CO., Appellant.

In Re: HARE & CHASE OF CINCINNATI, INC.

Ohio Appeals, First District, Hamilton County.

Nos. 6102 & 6103.   Decided June 29, 1942.

410

Messrs. Ernst, Cassatt & Cottle, Cincinnati; Messrs. Moulinier, Bettman & Hunt, Cincinnati; Mr. Hubert T. Campbell, Cincinnati, and Mr. John E. Shepard, Covington, Ky., for Bankers Discount Corporation.

. Messr. Ignatius & Stone, New York City; Messrs. Dolle, O'Donnell & Cash, Cincinnati, and Mr. George E. Fee, Cincinnati, for Royal Indemnity Company.

GUERNSEY, J., of the Third Appellate District, sitting by designation in the First Appellate District.

## OPINION

By MATTHEWS, P. J.

These cases are appeals on both law and fact and were heard de novo by this court. Both cases resulted from the collapse of the financial structure built by Hare & Chase, Inc., a corporation under the laws of Delaware, with its principal office in Philadelphia, Pa., from which it did a general automobile financing business, aggregating as much as $60,000,000 annually from 1918 until its difficulties developed in 1927, when it went into virtual liquidation. During the last year of its active career it extended its operations to Cincinnati and two funds were caught and have been held in custodia legis here while the rival claimants therefor have contended in this litigation.

The extension of the activities of Hare & Chase, Inc., to Cincinnati took the form of acquiring certain notes secured by chattel mortgages on automobiles aggregating about $145,000 from Bankers' Discount Corporation in exchange for 1638 shares of the preferred stock of Hare & Chase, Inc. Under the contract, it was provided that Bankers' Discount Corporation should act as trustee and agent for Hare & Chase, Inc., in the collection of the notes until such time as Hare & Chase should establish some sort of a branch agency in Cincinnati to handle that part of its business.

Shortly thereafter, Hare & Chase, Inc., caused the incorporation under the laws of Ohio of Hare & Chase of Cincinnati, Inc., which became a wholly owned subsidiary of Hare & Chase, Inc., the parent Delaware corporation. Hare & Chase, Inc., invested $2,000 in the preferred stock of this Ohio subsidiary and that was the total of its original capital.

Bankers' Discount Corporation as trustee and agent of Hare & Chase, Inc. proceeded to collect from those liable on the notes it had transferred to Hare & Chase, Inc., remitted some of the proceeds to Hare & Chase, Inc., in Philadelphia, but at the time of the collapse of Hart & Chase, Inc. in 1927 had to its credit in a local bank a certain sum and some money was collected later and held here by agreement. The residuum, ($51,207.35) of these sums is now in the hands of the clerk of courts subject to the order of this court in Case No. 6102.

Hare & Chase of Cincinnati, Inc., acting as subsidiary of Hare & Chase, Inc., proceeded to do the business of dealing in notes secured by mortgages on automobiles until the collapse of Hare & Chase, Inc., and had accumulated assets and incurred debts to Hare & Chase, Inc. Its credit depended upon the credit of the parent corporation and when that was withdrawn it ceased to do business. Shortly thereafter (September 7th, 1927) the parent corporation filed in the Common Pleas Court of Hamilton County the action to dissolve Hare & Chase of Cincinnati, Inc. and that action is No. 6103 under consideration now. The Court of Common Pleas in due course entered a decree of dissolution and appointed a receiver to liquidate its affairs. The last report of the receiver shows a balance of $37,444.97. By subsequent orders of the court, the receiver was authorized to pay from this fund sums aggregating $10,000, leaving about $27,000 after paying all claims against the dissolved corporation.

The right to these two funds has finally come to depend upon the decision of a contest between Bankers' Discount Corporation and Royal Indemnity Company, neither of whom asserts any right against the subidiary corporation. Each asserts a claim arising out of its relation to the parent corporation and each asserts a superior equity. It becomes necessary, therefore, to consider the transactions which these rival claimants had with the parent corporation.

We have already mentioned the transfer of notes and mortgages aggregating about $145,000 from Bankers' Discount Corporation to Hare & Chase, Inc. It is admitted now that Bankers' Discount Corporation was induced by fraud to make that transfer, and that as against Hare & Chase, Inc. it had the right to rescind: and still has unless it has lost that right by laches or by taking an inconsistent position.

Case No. 6102 is an action in which Hare & Chase, Inc. sought an accounting from Bankers' Discount Corporation of money collected by it from those liable on the notes transferred to Hare & Chase, Inc. and Bankers' Discount Corporation by cross-petition sought a rescission of the contract under which the notes were transferred and an accounting from Hare & Chase, Inc. of the collections made by it. The fund in the hands of the clerk of courts resulted from the accounting.

(1) Now has Bankers' Discount Corporation forfeited its right of rescission by its conduct?

Shortly before February 4th, 1927, the Bankers' Discount Corporation received information that Hare & Chase, Inc. was in financial difficulties. A meeting of stockholders was called to be held on that day and two officers of Bankers' Discount Corporation attended. At that meeting it was disclosed that the financial difficulty resulted largely, if not entirely, because of a large amount of notes secured by mortgages on taxicabs which were not being paid as they matured. From the nature of the transactions the disclosure at this meeting could not be full and complete, and an officer of Hare & Chase, Inc. stated that an audit was being made and a report thereof would be furnished to the stockholders. The report was never furnished. The officers of Bankers' Discount Corporation were sufficiently informed at this meeting to cause reasonably discreet persons to conclude that the representation that Hare & Chase, Inc. had no taxicab paper was false, but the precise or even approximate extent that the value of the preferred stock would be affected thereby could not be determined at that time from the available information. However, one of the officers of Bankers' Discount Corporation testified that at that time he tendered the return of the certificate which was not accepted.

Bankers' Discount Corporation at that time was in the process of voluntary liquidation. After this meeting, its president, who had attended it, sent a full report to the stockholders of what he had discovered, stating that the intention had been to distribute the Hare & Chase, Inc. preferred stock among the stockholders of Bankers' Discount Corporation, but that, in view of this development, it was deemed wise to hold the stock in one block, that an audit and investigation of Hare & Chase, Inc. had been promised and that the result would be communicated to the preferred stockholders at a meeting which would be called for that purpose at an early date and that he, the president, would attend that meeting and would then advise the stockholders of Bankers' Discount Corporation of the action there taken. Nothing was said in this letter either on the subject of affirmance or of disaffirmance of this contract. The report of the audit was never furnished and the suggested meeting was never called.

Thereafter, Bankers' Discount Corporation continued to collect from those liable on the notes which it had transferred to Hare & Chase, Inc. and to deposit the proceeds in a local bank. It also reinvested a small amount, but no part

of the proceeds in any form was thereafter sent to Hare & Chase, Inc. Two of its officers were paid salaries by Hare & Chase, Inc. during a part of this interval.

It should also be mentioned that during this period the preferred stock's market value steadily declined, but there is no suggestion that its intrinsic value deteriorated in this interval.

That situation continued until August 27th, 1927 when Hare & Chase, Inc. filed the action in the Court of Common Pleas for an accounting, and in which Bankers' Discount Corporation, on September 24th, 1927, filed its answer and cross-petition, praying for a rescission and accounting.

Now do these facts preclude rescission?

We are of the opinion that statements made by the officers of a corporation to its stockholders in a meeting of stockholders or by mail as in this instance relating to the internal affairs of the corporation cannot be considered as binding upon the corporation by third persons who have dealt or may deal with the corporation. Information disseminated among the constituents of an organization—corporate or non-corporate—has no such purpose or effect. **Asbury v Hugh L. Bates Lodge, 62 Oh Ap, 430 at 433.** At most, the statements in the letter of Bankers' Discount Corporation have the status of unexecuted intention so far as Hare & Chase, Inc. and Royal Indemnity Co. are concerned. Furthermore, there is no statement that Bankers' Discount Corporation waived or intended to waive the right to rescind and the language used is compatible with the retention of that right. Postponement of distribution of the Hare & Chase, Inc. stock among Bankers' Discount Corporation stockholders certainly does not import a waiver. Nor does attendance at a meeting of Hare & Chase, Inc. stockholders, at which disclosure of the extent of the fraud would be made, show any intent to waive. Bankers' Discount Corporation in its capacity as a victim of fraud had a right to information from Hare & Chase, Inc. as to the extent of the damage resulting from the fraud. Bankers' Discount Corporation had a right to demand such information from Hare & Chase, Inc., the officers, directors, and stockholders, and attendance at a meeting of stockholders for such purpose could not be considered in law as a reliance upon ownership of stock. We are also of the opinion that delay awaiting promised information on the subject has no tendency to prove an election.

The action of Bankers' Discount Corporation in collecting upon the notes, and, to a small extent, reinvesting the proceeds, was, at most, under the circumstances, equivocal. If it affirmed the contract, it was authorized to so act by the contractual terms. If it rescinded, it owned the notes and as owner had that power.

Hare & Chase, Inc. permitted Bankers' Discount Corporation to exercise this power to collect notwithstanding its failure to remit the proceeds of collection from February to September—a period of about nine months—and it is urged that this constituted laches. There was greater reason for action by Hare & Chase, Inc. than by Bankers' Discount Corporation during that period. The only risk the latter ran by delaying was the intervention of innocent third persons. Under such circumstances, delay awaiting action by Hare & Chase, Inc. in which to assert its right cannot be considered laches or an election in view of the fact that Bankers' Discount Corporation was withholding collections during that period. In 2 Restatement of the Law of Contracts, §483, illustration 4, it is said: "A refusal of performance though no reason was given for it is a sufficient exercise of the power of avoidance." Bankers' Discount Corporation's failure to remit resulted finally in the filing of this action in which it promptly asserted its right based on rescission. Treating Bankers' Discount Corporation's conduct as inaction—although the implication from retention of collections seems to suggest rescission—such inactivity could not be construed as choice either to affirm or rescind. Richards v Suisse, 245 N. Y. 346, 45 A. L. R. 1041.

Counsel have suggested other circumstances should be considered in determining whether Bankers' Discount Corporation had elected to retain this stock. We fail to find any signficance in them.

So we conclude that as against Hare & Chase, Inc., Bankers' Discount Corporation had not forfeited its right to rescind. But it is urged that assuming the right to rescind against Hare & Chase, Inc., there is no such right against Royalty Indemnity Company. It is pointed out that the right to rescind is a mere equity, rendering the legal title voidable, and that this equity cannot be asserted and the legal title avoided against an innocent purchaser for value without notice of the equity. It is asserted that Royal Indemnity Company occupies that position. This claim requires a considera-

tion of the relation between Royal Indemnity Company and Hare & Chase, Inc.

The capital of Hare & Chase, Inc. was insufficient to do the volume of business available to it and it was necessary to resort to borrowing in order to do this large volume. Its assets, as already stated, consisted almost wholly of notes secured by liens upon automobiles. To render this asset liquid in large volume, it resorted to the device of a trust against which the trustee issued certificates. The Equitable Trust Company became the trustee under this arrangement of a very large mass of notes secured by liens on automobiles and delivered certificates to Hare & Chase, Inc. reciting the fact that it was the holder of specific notes and mortgages. Hare & Chase, Inc. was bound to the trustee to prevent a default on any of the obligations deposited with it.

The design of Hare & Chase, Inc. was to borrow money from banking institutions on these certificates and in order to make them more alluring as collateral, it made an arrangement with Royal Indemnity, whereby it guaranteed the collectibility of the notes deposited with the trustee. In the agreement between Hare & Chase, Inc. and Royal Indemnity Company, entered into at the inception of the relation in 1918, it was expressly agreed that the former would indemnify the latter against loss and that all collateral should be available to the latter for the purpose of indemnification.

The parties proceeded under this contract from 1918 to 1927 in the normal way, when it became known that Hare & Chase, Inc. was involved in the transaction that threatened to, if it did not bring about, its insolvency. The impending failure of Hare & Chase, Inc. threatened Royal Indemnity Company with liability for many millions of dollars upon its guaranty. In that situation, Royal Indemnity Company, in order to avoid or minimize this loss, through its officers and subsidiary, took actual control of the conduct of the business of Hare & Chase, Inc. and prevented its failure by advancing large sums, so that it could meet its obligations as they matured.

Royal Indemnity paid nothing to Equitable Trust Company or to any holder of any certificate issued by it, or to any other creditor of Hare & Chase, Inc., although, undoubtedly the money advanced by Royal Indemnity Company enabled Hare & Chase, Inc. to continue its business and meet these obligations as they matured.

The net result of the operation of the business of Hare & Chase, Inc. by Royal Indemnity Company was to create an indebtedness to it of $3,700,000 for the advancement made while it was operating the business.

It is the claim of Royal Indemnity Company that it has a lien upon the fund in the hands of the clerk of court, superior to the claim of Bankers' Discount Corporation, because that fund is the proceeds of notes placed by Hare & Chase, Inc., with Equitable Trust Company which were paid by money advanced by it to Hare & Chase, Inc. and also because the notes after their surrender by Equitable Trust Company to Hare & Chase, Inc. were transferred and assigned by Hare & Chase, Inc. to it.

As to the claim of an express transfer of the notes after their surrender by Equitable, it seems sufficient to say that, in our opinion, the evidence fails to prove it, and, furthermore, at that time, Royal Indemnity Company had notice of the facts constituting the fraud upon Bankers' Discount Corporation and of its equity resulting therefrom and could not by any action then taken strengthen its position. Of course, if any innocent person had acquired title for value before then, Royal Indemnity could have acquired that title which would have been invulnerable to attack by Bankers' Discount Corporation, but that brings us back to the question of whether Royal Indemnity Company succeeded by subrogation or assignment to the title of Equitable Trust Company or any other purchaser for value without notice of this fraud. It is true that there is evidence that these Bankers' Discount Corporation notes were segregated on their return from Equitable Trust Company and were kept segregated from that time until the control of Royal Indemnity Company. But upon maturity the amount was paid to Equitable Trust Company by Hare & Chase, Inc., albeit in a sense with money advanced by Royal Indemnity Company and they were segregated and kept segregated by virtue of an agreement with Hare & Chase, Inc. and not with Equitable Trust Company. So this latter agreement was with the fraudulent party with knowledge by Royal Indemnity Company of the fraud. Its position is not strengthened by it.

The Royal Indemnity Company is, therefore, thrown back on the original transaction as the basis of its claim to a superior title or lien, but this claim must fail unless it paid the debt upon which it was a surety or guarantor. There is no evidence of an agreement that these notes were pledged as

security for all indebtedness due or to become due to Royal Indemnity Company from Hare & Chase, Inc. The claim is that they were to secure it for anything it might be required to pay as a guarantor. And it is urged upon us that while Royal Indemnity Company never paid anything directly to Equitable Trust Company, it virtually did so as to the money it advanced Hare & Chase, Inc.

Now who paid Equitable Trust Company? Certainly, it took the form of a payment by Hare & Chase, Inc. Royal Indemnity Company had no transaction with Equitable Trust Company that took the form of a payment of the obligation which these notes secured. Royal Indemnity Company advanced money to Hare & Chase, Inc. The money became the property of Hare & Chase, Inc. Hare & Chase, Inc. became bound in a new agreement to repay. But when Hare & Chase, Inc. paid Equitable Trust Company it was with its money—not with Royal Indemnity Company's money.

The case of **Zuellig v Hemerlie et, 60 Oh St 27,** is cited, but the facts show that the surety constituted the principal debtor his agent for the specific purpose of taking his money to the creditor. The money was not advanced as in this case to be used, and actually used, in the conduct of the principal debtor's business generally. The expense of operating this enormous business must have been great and the advancements made by Royal Indemnity Company could, under the circumstances in which they were made, and propably were to a considerable extent, used in paying these expenses. The fact that the entire principal obligation was paid in the conduct of the business leaving the principal debtor without assets and indebted to the surety for a part of the money advanced does not, in our opinion, bring this case within the principle of Zuellig v Hemerlie, supra. It only shows that the purpose in advancing the money to conduct the business was not as fruitful as was desired or expected.

Our conclusion is, that the fund in the hands of the clerk of courts is the property of Bankers' Discount Corporation.

(2) We now proceed to consider the rights of Royal Indemnity Company and Bankers' Discount Corporation in the funds in the hands of the receiver appointed to liquidate the business of Hare & Chase of Cincinnati, Inc.

It is conceded that neither Bankers' Discount Corporation nor Royal Indemnity Company had any contractual relations with Hare & Chase of Cincinnati, Inc. It was indebted to neither. In contending for exclusive right to the fund each

has endeavored to prove that this fund is its property in a converted form. This effort to trace the fund was definitely abandoned by Bankers' Discount Corporation and tentatively abandoned by Royal Indemnity Company. As to the latter, we are of the opinion that its effort to trace failed. So we cast to one side the effort to make this controversy turn on an original proprietary interest in the fund.

The parties, therefore, entered this litigation as general creditors of Hare & Chase, Inc., an insolvent debtor, having only one asset, and that asset being all the outstanding stock of Hare & Chase of Cincinnati, Inc. and as such entitled to this entire fund on distribution by the receiver. As against these two creditors, who are its sole creditors, Hare & Chase, Inc. make no claim to this fund, and could not well do so, in view of the fact that Hare & Chase, Inc. is insolvent and has ceased to carry on its business. The fund as between it and its creditors must be considered a trust fund for the equal benefit of the creditors. **Rouse v Bank, 46 Oh St 493.**

The first court action taken by Bankers' Discount Corporation to assert its claim was by cross-petition in the action that was instituted against it by Hare & Chase, Inc. The prayer of that cross-petition was for a rescission, for an accounting, and an order to pay the amount found due, and for general relief. Hare & Chase of Cincinnati, Inc. was not a party and the case has none of the earmarks of any form of creditor's bill, either in its allegations or its prayer. **11 O. Jur. 938 et seq.;** 14 Am. Jur. 679 et seq. No specific res—this fund or any other—was described in the pleadings, or in any other way, and, consequently, Bankers' Discount Corporation's position is not helped by an appeal to the doctrine of lis pendens. **34 Am. Jur., 377, et seq.**

We are, therefore, of the opinion that when the action was filed by Hare & Chase, Inc. praying for the dissolution of Hare & Chase of Cincinnati, Inc., Bankers' Discount Corporation and Royal Indemnity Company had the same legal status with reference to the assets of Hare & Chase of Cincinnati, Inc. Neither had any cause of action against that corporation or any proprietary interest in any assets under its control, but both were general creditors of the owner of all of its outstanding capital stock. Consequently, if these general creditors occupy now a different status inter sese, it must result from action taken in the dissolution proceeding.

Now the proceeding to dissolve Hare & Chase of Cincinnati, Inc. was instituted under favor of §§8623-85 et seq., GC. We

think it is correct to state that the law is that, within constitutional limitations, the effect of the pendency of the dissolution proceedings upon the rights of persons in the subject-matter depends entirely upon the applicable statutes. It was a proceeding quasi in rem. It related to property in the custody of the court, of which the court was given jurisdiction to dispose. It was entirely competent for the General Assembly to suspend the rights which claimants would otherwise have to pursue remedies and require them to assert their rights, if at all in the dissolution proceedings. And that is what was done by §8623-92 GC. By that section, it was enacted that:

"Whenever, after either voluntary or judicial dissolution of a corporation, a receiver is appointed to wind up the affairs of such corporation, all the rights, interest, liens or claims of creditors, claimants and shareholders shall be fixed and determined as of the day on which such receiver was appointed.

"Unless it shall be otherwise ordered, such appointment shall vest in such receiver and his successors the right to the immediate possession of all the property of the corporation, which shall, if so ordered, execute and deliver conveyances thereof to such receiver or his nominee."

This section is clear and by it and §8623-93 GC, is disclosed a legislative intent to confer upon the court the exclusive jurisdiction to adjudicate the rights of all claimants against the corporation and its assets.

And by §8623-85 GC, the legislature has given to the court full power to order that claims should be presented to the receiver as was done in this proceeding rather than by encumbering the record. It is true that by §8623-93 GC, the court was granted power to allow formal intervention and these claimants were granted that leave and have availed themselves of it. Still the language just quoted from §8623-92 GC, precludes any advantage being acquired by such intervention.

Counsel admit that this is the true meaning as applied to creditors of and those interested in the corporation, whose assets are being administered, but they say that these claimants are not creditors of that corporation. They say they are creditors of Hare & Chase, Inc. and not of Hare & Chase of Cincinnati, Inc. But each is asserting a right derived from

Hare & Chase, Inc. as a stockholder of Hare & Chase of Cincinnati, Inc. The statute would prevent the stockholders from obtaining any advantage pending the action. We think it prevents those claiming through the stockholders as against other claimants to rights against Hare & Chase of Cincinnati, Inc. or inter sese.

The situation is this: At this time the liquidation has reached the point where it can be seen that there will be a distribution to the stockholders or to those succeeding to its right. But until the order appealed from was made, the court had not adjudicated the rights of the parties. Indeed, at no time was the amount payable definitely fixed. Now the receiver has a right to have the order of the court as to whom the money should be paid. The stockholder is before the court as plaintiff. It is an insolvent corporation, with no assets and only two creditors. It asserts no title against these two creditors. Under the circumstances, it belongs to them in equity. They were general creditors of Hare & Chase, Inc., entitled to share pari passu in its assets and when on the insolvency of the debtor and its cessation of business its assets became a trust fund they succeeded to its title, without preference or priority. They entered this litigation as such general creditors. Both by reason of the statute and under the general principle of lis pendens the court would be required to reject a claim to a superior right based on action pendente lite.

There is another principle that is equally decisive against the claim of Bankers' Discount Corporation. That is the the principle that protects the jurisdiction of the court over the fund in its custody until it has finally adjudicated the rights of the parties thereto. Until the court has completed the judicial process by a judgment awarding the fund to one of the litigants, the fund is in custodia legis and immune from sequestration by process issuing from any other court. Orlopp v Schneller, Admr., 72 Oh St 41, 73 N. E. 1012; Pierce v Fortner, 64 Oh Ap 544.

We, therefore, conclude that the fund in the hands of the receiver should be distributed ratably between Bankers' Discount Corporation and Royal Indemnity Company in the ratio that their claims bear to one another.

Judgment entries may be presented to carry our conclusions into effect.

ROSS and GUERNSEY, JJ., concur.