[Civ. No. 2660.   Fourth Dist.   June 23, 1942.]

In re SAN JOAQUIN LIGHT AND POWER CORPORA-
TION (a Corporation), on Voluntary Dissolution.  SAN
JOAQUIN LIGHT AND POWER CORPORATION (a
Corporation), Petitioner and Appellant; PACIFIC GAS
AND ELECTRIC COMPANY (a Corporation), Re-
spondent and Appellant; AMBROSE GHERINI et al.,
Respondents.

Chickering & Gregory, Robert H. Gerdes, Wm. B. Bosley and Thos. J. Straub, for Appellants.

Ambrose Gherini in pro. per., Arthur B. Dunne, Dunne & Dunne, Bradford M. Melvin and Gregory, Hunt & Melvin, for Respondents.

BARNARD, P. J.—This is an appeal from a judgment entered in a proceeding brought under section 403 of the Civil Code.

We will refer to the San Joaquin Light and Power Cor-

poration as San Joaquin and to Pacific Gas and Electric Company as Pacific. For many years prior to the time in question San Joaquin was a public utility supplying electricity, gas and water to consumers in Fresno and other counties. In August, 1938, it began proceedings to dissolve voluntarily and wind up its affairs as provided for in sections 400 et seq. of the Civil Code. About 89 per cent of its outstanding stock was then owned and held by Pacific.

On August 10, 1938, Pacific executed a written consent to the voluntary dissolution and winding up of the affairs of San Joaquin. On August 11, 1938, San Joaquin's board of directors adopted a resolution electing to proceed to wind up its affairs and effect its voluntary dissolution, and authorizing the taking of steps to that end. A certificate was filed with the secretary of state and recorded in Fresno County in accordance with section 400 of the Civil Code, and a notice to creditors and stockholders was mailed as provided for in section 400a of that code.

On August 11, 1938, San Joaquin and Pacific executed a contract reciting that San Joaquin has elected to wind up its affairs and voluntarily dissolve; that San Joaquin has outstanding 129,569 shares of common stock and 206,718 shares of preferred stock, all of which except 702 shares of common stock and 34,849 shares of preferred stock are owned by Pacific; that San Joaquin is indebted to Pacific for money advanced in a sum exceeding $32,700,000 and has outstanding mortgage bonds in the sum of $9,181,500; and that it is the desire of both parties to expedite the winding up and liquidation of San Joaquin and the distribution of its assets. This contract then provided, in brief, as follows: 1. Pacific will, subject to the approval of the Railroad Commission, submit to the holders of San Joaquin's preferred stock (other than Pacific) a fair offer to exchange its own preferred stock for their San Joaquin stock. 2. Pacific will loan to San Joaquin all money necessary to enable it to comply with this agreement. 3. San Joaquin will pay in full the par value and accrued dividends to minority preferred stockholders who do not accept Pacific's offer for an exchange of preferred stocks. 5. San Joaquin will purchase "at their fair value and retire" all shares of its common stock held by its stockholders (other than Pacific) or "will cause the fair value of such minority common stockholders' proportional share of its net distributable assets to be ascertained in accordance with the provisions of the general corporation law" of this state and will

pay to such minority common stockholders "the full amount of money to which they shall be entitled." The next four paragraphs provide that San Joaquin, after paying its current debts and the other payments required by the contract, will pay and assign to Pacific on account of its debt to the latter all remaining money, all securities and all current assets, and Pacific will release San Joaquin's remaining indebtedness to it and will assume and agree to pay the funded debt and all other debts and liabilities of San Joaquin. Paragraph 10 then provides that San Joaquin "will distribute to Pacific Company, as its sole remaining stockholder, after payment of all amounts payable to its minority preferred stockholders and minority common stockholders, all of its plants, properties and other assets." The remaining paragraphs of the contract provide that both corporations shall apply to the Railroad Commission and to the Federal Power Commission for the necessary orders authorizing San Joaquin "to distribute and transfer to Pacific Company its plants, properties and other assets, in conformity with the provisions of this agreement."

On October 13, 1938, the Railroad Commission entered and filed an opinion setting forth a summary of the contract of August 11, 1938, including the provision that San Joaquin's plants, properties and other assets were to be distributed to Pacific "as its sole remaining stockholder," followed by an order permitting San Joaquin to distribute and transfer to Pacific its plants, properties and other assets "in conformity with the provisions of the agreement between said companies dated August 11, 1938." By December 27, 1938, Pacific had acquired all of San Joaquin's outstanding preferred stock except 799 shares, and San Joaquin had retired these 799 shares by paying the holders the par value thereof with accrued dividends. Also, San Joaquin had offered to purchase for retirement and cancellation all shares of its common stock at $120 per share and had thus purchased and retired 349 shares of such stock.

On December 27, 1938, San Joaquin adopted a plan for the disposition of its current assets and for the distribution among its stockholders of its plants, properties and other assets. So far as material here, this plan provided that San Joaquin would: 1. Set aside $250,000 for the purpose of paying its common stockholders (other than Pacific) "the fair value of their proportional shares" of its net distributable assets; 2. Assign all current assets, pay all other money and dis-

tribute all other assets to Pacific; and 3, institute a proceeding in the Superior Court of Fresno County for the purpose of obtaining a determination of the rights of all common stockholders (other than Pacific) in and to San Joaquin's assets in conformity with the provisions of section 403 of the Civil Code, prosecute such proceeding to its conclusion, and pay these minority stockholders the amount which should be awarded to them or, as an alternative, pay said minority common stockholders $120 a share for the stock held by them.

On December 31, 1938, San Joaquin deposited $250,000 in a special account, assigned and paid to Pacific all its current assets, securities and other money, and "distributed" and conveyed to Pacific all of its plants, properties and other assets, although the transfer of certain licenses and permits was not fully completed until a later date when the approval of the Federal Power Commission had been obtained.

This proceeding followed, the order to show cause being issued on January 10, 1939. The second amended and supplemental petition sets forth the above facts and further alleges that the contract of August 11, 1938, is equitable, just and reasonable; that the plan of distribution adopted on December 27, 1938, is in substantial conformity with that contract and is equitable, just and reasonable; that San Joaquin has offered and now offers to purchase any and all stock held by its minority stockholders at $120 per share; that the four named respondents have rejected San Joaquin's offer to purchase and retire their stock; and that these four persons have at all times since December 27, 1938, controverted the validity, equity and fairness of the plan of distribution adopted, the right of the San Joaquin to dispose of and distribute its assets according to this plan, and its right to wind up its affairs and voluntarily dissolve without their consent. The prayer is that the court will appoint a referee to take evidence and ascertain and report the facts found with respect to any issues of fact which may arise in the proceeding, that the court will pass upon and determine the right of the minority stockholders to the assets of San Joaquin, will pass upon and determine any and all other matters concerning the dissolution and winding up of the affairs of San Joaquin, and will make and enter such judgment as shall be in accordance with law and equity.

Pacific filed an approval and ratification of all matters recited in the petition, with the request that the court determine all matters in controversy between San Joaquin and its stock-

holders and thereupon make and enter such judgment as should be just and equitable. The individual respondents filed demurrers raising the points that the petition stated no cause of action or facts warranting any relief, and stated no justiciable controversy; that the court was without jurisdiction under Civil Code section 403, or otherwise, to grant any relief here sought; that there was a want of a necessary party (Pacific) ; that there were no facts sufficient to show the existence of any controversy; that neither San Joaquin nor Pacific had the capacity to sue or bring this proceeding; that several causes of action were improperly joined; and that this proceeding constitutes an attempt to condemn and take private property for private use in violation of the state and federal Constitutions. The court sustained the demurrers, with twenty days in which to amend. No such amendment being filed, the court entered a judgment decreeing that this petition does not state facts sufficient to constitute a cause of action or ground for any relief against any of the respondents; that Pacific is a trustee for the minority stockholders of San Joaquin and neither it nor San Joaquin on any attempted dissolution of San Joaquin is entitled to distribute assets of San Joaquin in kind to Pacific as a common stockholder of San Joaquin and to require the other common stockholders to take cash in satisfaction of their rights, or to make any distribution in kind except ratably to all of the common stockholders of San Joaquin; that the plan adopted by San Joaquin for the distribution of its assets to its common stockholders is null and void as to the individual respondents; that the attempted distribution by San Joaquin to Pacific of all of its assets other than certain cash is null and void as to the individual respondents; that the contract of August 11, 1938, is null and void as to the individual respondents; that upon the facts alleged Pacific has no right to any preferential treatment and the individual respondents are each entitled to his proportionate share of any distributable assets, and to participate proportionately in the distribution of its assets in like manner as is Pacific; that neither San Joaquin nor Pacific take anything by reason of the petition filed; and that the respondents recover their costs. From this judgment both San Joaquin and Pacific have appealed, and the appeals have been presented together. After the entry of judgment respondents Simonson and Harper sold their stock to San Joaquin and have disclaimed any further interest in the pro-

ceeding. It now appears that all of San Joaquin's outstanding stock, other than that owned by Pacific, has been retired or disposed of with the exception of 253 shares of common stock, 250 shares of which are owned by respondents Gherini and Nicolai.

Appellants' main contention is that a corporation in the process of voluntarily dissolving and winding up its affairs under sections 400 et seq. of the Civil Code may adopt and execute a plan of distribution under which its plants and business properties shall be distributed to a majority stockholder and the remaining shareholders shall be paid in cash their proportion of the fair value of the net assets, and that such fair value, if not agreed upon by the parties, may be judicially determined in a proceeding under section 403 of that code. It may be here observed that the Articles of Incorporation of San Joaquin provide that in the event of any dissolution the preferred stockholders are to be paid in full and that "the remaining assets and funds shall be divided and paid to the holders of the common stock according to their respective shares." Simply stated, the question here is whether upon a voluntary dissolution of this corporation this provision of the Articles may be disregarded and the main assets constituting the going business may be distributed in kind to the majority common stockholder while compelling the minority common stockholders to take the cash value of their proportionate share of the total assets. The weight of authority appears to be that this may not be done in the absence of statutes permitting such a form of distribution. (*Ervin* v. *Oregon Ry. & Nav. Co.,* 20 Fed. 577 and 27 Fed. 625 [23 Blatchf. 517] ; *Forrester* v. *Boston & M. etc. Co.,* 21 Mont. 544 [55 Pac. 229, 353] ; *Theis* v. *Spokane Falls Gas Light Co.,* 34 Wash. 23 [74 Pac. 1004] ; *Jones* v. *Missouri-Edison Elec. Co.,* 144 Fed. 765 [75 C. C. A. 631] ; *William B. Riker & Son Co.* v. *United Drug Co.,* 79 N. J. Eq. 580 [82 Atl. 930, Ann. Cas. 1913a, 1190] ; *Paine* v. *Saulsbury,* 200 Mich. 58 [166 N. W. 1036] ; *In re Doe Run Lead Co.,* 283 Mo. 646 [223 S. W. 600].) In *Ervin* v. *Oregon Ry. & Nav. Co., supra,* the court said:

"They never contemplated winding up the business of the old company, and distributing the assets among its stockholders, otherwise than as a formal mode of doing what they could not do by legal sanction. They intended to do, and what they practically did, was to effect a consolidation of the old company with the new, using as the means for the end

the statutory power which authorized a majority of stockholders to dissolve the corporation, settle its business, and dispose of its property. . . .

"The defendants have adjusted their own interests on the basis of a consolidation of the two corporations and a continuance of their business as a joint venture; but they now insist that the interests of the minority stockholders, who have not been permitted to participate with them, shall be adjusted on the basis of a dissolution and a cessation of the business which they originally associated together to conduct."

In *In re Doe Run Lead Co., supra,* the court said:

"It cannot be that the Legislature intended that a statute which was designed merely to facilitate a bona fide dissolution should be used as an easy method of effecting a consolidation, particularly when one of the avowed purposes of this proceeding is to enable the interested corporations to evade certain revenue laws of the state. 'Dissolution' means a going out of business, a cessation of business activity—business death, in short. Sections 2996 to 3000, *supra,* were designed to furnish means of accomplishing that end. Consolidation implies continued life and increased activity. 'Over all things certain, this is sure indeed,' that business death is the thing farthest from the intention of the St. Joseph Company and the will of the St. Joseph Company is the will that controls this proceeding, though it is brought in the name of the Doe Run Company. 'The voice is Jacob's voice, but the hands are the hands of Esau.' To use a somewhat gruesome metaphor, what is here being attempted is not corporate suicide, but corporate homicide. It is equally plain that the statute by which the St. Joseph Company seeks to attain that end was never intended to be used to permit one corporation to take the life of another."

Nor do we think the form of distribution upon dissolution which is here contended for is authorized or permitted under our statutes. Section 343a of the Civil Code formerly provided for the giving of "compensation" to dissenting stockholders in certain cases and under certain conditions. But that section was repealed in 1933. The code provisions relating to the consolidation or merger of corporations now provide a method (Section 369 of the Civil Code) whereby dissenting stockholders may be paid the value of their shares instead of receiving an interest in the new or surviving corporation, but only in case they themselves elect to do so and take the proper steps therefor.

The statutes governing the voluntary dissolution of a corporation, so far as material here, are sections 400 to 403 of the Civil Code. Section 401, among other things, gives to the directors of such a corporation the power to sell, exchange or otherwise dispose of all or any part of the assets. Section 401a provides that after taking care of the debts and liabilities the directors "shall distribute all the remaining corporate assets among its shareholders and owners of shares according to their respective rights and preferences" and that "distribution may be made either in money or in property or securities, if this can be done fairly and ratably and in conformity with the provisions of the articles and the rights of the shareholders." It further provides that a distribution among shareholders of shares in or securities of another corporation shall be deemed to be a fair and ratable distribution if made in accordance with the plan provided for in section 401c. That section provides that a plan for distributing the shares or securities of another corporation or "assets other than money" among the owners of common and preferred stock in a corporation which is being wound up may be adopted if such distribution is approved by the directors and by two-thirds of the stockholders, and that such plan shall then be binding upon all shareholders "except as hereinafter provided." The exception then provided is that dissenting shareholders "having a liquidation preference" may within thirty days demand payment of "the amount of such liquidation preference in cash," and that if such a demand is made the directors may then abandon such plan of distribution in which event "all shareholders shall then be entitled to distribution according to their rights and liquidation preferences."

Section 403 of the Civil Code provides that where a corporation is in the process of voluntary winding up and upon the petition of the corporation the superior court shall have power "to order and adjudge as to any or all matters in and for the winding up of the affairs of the corporation," including "(3) The determination of the rights of shareholders and of all classes of shareholders in and to the assets of the corporation."

It seems clear that under the provisions of sections 401 and 401a the directors of a corporation may sell and convert into money all of its properties and assets, and after paying its debts distribute the remainder among the stockholders according to their respective rights. It seems equally clear that a corporation's properties and assets, other than money, may

also be distributed among its stockholders if this can be done fairly and ratably and in conformity with the provisions of the articles and the rights of the shareholders. The appellants further contend, however, that section 401c, taken in connection with sections 401 and 401a, should be interpreted as permitting the adoption of a plan whereby minority stockholders may be paid the value of their stock and the rest of the properties and assets of the corporation may be distributed to the majority stockholder; that in the absence of agreement between the parties such value may be determined in a proceeding brought under the provisions of section 403 of the Civil Code; that there was no lack of equity, fairness or reasonableness in the plan here adopted; and that through this plan the minority common stockholders would receive the cash value of their shares which is exactly what they would have received had the directors sold all of the assets for money and distributed the proceeds. In connection with this last contention it may be here observed that had all of the assets been sold and the proceeds distributed all of the stockholders would have been treated alike whereas under the plan here attempted the majority stockholder obtains and may continue a going business, whereas the minority stockholders are compelled to take the present value of their respective shares.

While we think the court erred in other respects we think it was correct in its conclusion that the plan here proposed was not authorized by our statutes and, clearly, it was not in accordance with San Joaquin's Article provisions. While section 401 permits the sale or exchange of all assets of a corporation section 401a provides for the distribution of all remaining assets among the stockholders according to their respective rights. Not only was there no sale or exchange of the corporate assets here, but the language used in section 401a clearly implies that all common stockholders are to be treated alike and in proportion to their holdings of stock. While section 401a also permits the distribution of assets other than money where this can be done fairly and ratably and in conformity with the articles, nothing therein in any way indicates an intention to permit a distribution in kind to some of the common stockholders while compelling others to turn in their stock for its present cash value. Nor do we think section 401c authorizes such a course of procedure. That section provides for a plan of distribution of shares or

securities of another corporation or of "assets other than money." It contains no provision for a plan of distribution calling for the distribution of assets other than money to certain stockholders and all money to other stockholders, and much less does it provide for compelling certain stockholders to take money while others receive assets other than money. The exception provided therein does not apply to common stockholders but provides, even where assets other than money have been distributed to all shareholders alike, for a liquidation preference, in other words shareholders holding preferred stock may at their option demand payment of their full preference instead of accepting a share in a distribution in kind.

Under such circumstances, the particular plan of distribution here in question cannot be legalized or carried out under and through the proceeding provided for in section 403. While that section confers upon the court broad powers in passing upon and adjudging controversies in connection with winding up the affairs of a corporation it is procedural in nature and adds nothing to the substantive rights which stockholders already have through the statutes, or otherwise. With respect to the first point raised, we therefore hold that a corporation in the process of voluntary dissolution has not the right to adopt and carry out a plan of distribution whereby its plants and business properties are distributed to a majority stockholder and its minority common stockholders are compelled to take their share of the value of the distributable assets, such value to be ascertained in a proceeding under section 403.

We think, however, the trial court was in error in dismissing this proceeding and in denying the petitioner any relief without hearing or determining the matters authorized and permitted to be raised in such a proceeding. San Joaquin had complied with all of the provisions of the statutes relating to the dissolution of a corporation, at least up to the point of arranging for the disposal and distribution of its assets. Proceedings for a dissolution had commenced (§ 400c, Civ. Code) and the corporation was in the process of a voluntary winding up. A petition was filed as authorized by section 403 of the Civil Code and the superior court then had "power to order and adjudge as to any or all matters in and for the winding up of the affairs of the corporation," including "(3) the determination of the rights of share-

holders . . . in and to the assets of the corporation." An absolute right to petition for such supervision and direction is impliedly given and we think it follows that the court not only has the power to order and adjudge as to all matters thus presented, but that the duty of so doing is imposed upon the court.

The right to invoke the supervision and settlement of disputed matters which is contemplated by the provisions of section 403 depends upon the conditions therein set forth for the filing of a petition and not upon whether or not such a petitioner is correct in all of his contentions with respect to the questions and issues which are to be presented for determination. The mere fact that a part of the plan here proposed for the distribution of its assets was improper and unauthorized did not mean that this corporation could not dissolve or that its legally commenced dissolution must be abandoned. Presumably, errors could be corrected and proper steps could be ordered and taken to dispose of the assets, to make a legal distribution and to wind up the corporation's affairs in accordance with our statutes and under the direction and guidance of the court. In any event, a hearing on the merits was called for and the matter could not be disposed of by sustaining demurrers and denying all relief to the petitioner. The purpose of the proceeding is to settle disputes, correct errors and obtain such orders as may be necessary to carry out and accomplish the end in view, and not merely to pass arbitrarily upon what has already been done.

The proceeding thus provided for by section 403 is in some respects not unlike the one for declaratory relief, authorized by section 1060 of the Code of Civil Procedure. It has been held that that statute should be liberally construed (*Tolle* v. *Struve,* 124 Cal. App. 263 [12 P. (2d) 61]) to the end that the intent of the statute may be carried out. (*Hess* v. *Country Club Park,* 213 Cal. 613 [2 P. (2d) 782].) Where a pleading discloses the facts required by that statute, such as an interest in a particular matter and the existence of an actual controversy relating thereto, it is unnecessary to allege matters which will justify the precise relief which may ultimately be given by the court. (*California C. P. Growers* v. *Corcoran,* 14 Cal. App. (2d) 264 [57 P. (2d) 1360].) Where the basic facts required by that statute are alleged, it has frequently been held that demurrers should not be sustained

and that the court should proceed to hear and determine the matters relating to which a controversy existed.

We think that a similar situation prevails here and that the facts alleged in the petition were sufficient to call for and require a hearing with such adjudications and orders as might prove necessary under the facts as they developed at the hearing. The appellants had a right to proceed by way of dissolution if they were willing to accept the consequences of proceeding in that manner rather than by way of merger or consolidation. And while they are bound by the statutory requirements therefor, they are also entitled to invoke the provisions of section 403 in order to secure both a determination of the controversy which has arisen and an adjudication of the matters necessary to complete the winding up of the affairs of this corporation. It follows that the demurrers to the petition should have been overruled and that the court should have permitted further proceedings to the end that it could hear the matters presented, determine the respective rights of the shareholders and hear and determine the other matters relating to the winding up of this corporation.

The appellants suggest that it may be difficult to undo what has been done and to segregate San Joaquin's properties which have been knit into and have become a part of Pacific's system, and that the rights of the public should be protected. It is, therefore, argued that respondents should be limited to a determination in the trial court of the fair value of their proper share of San Joaquin's distributable assets and to the payment of the amounts so found. *Jones* v. *Missouri-Edison Elec. Co.*, 144 Fed. 765 [75 C. C. A. 631] is cited as showing the powers of a court of equity in such a situation. In that case it was pointed out that the rights of many third parties might have intervened and it was stated that these might be considered by the court below and that the rules of equity were broad enough to permit relief other than that specifically asked for, if it became necessary, in order substantially to protect the interests of some without unduly prejudicing the interests of others. Any possible application of the rule suggested in that case is a matter for consideration in the trial court, after the full facts have been developed, and is not a matter to be determined on this appeal from a judgment of dismissal.

The appellants further contend that it was beyond the jurisdiction of the trial court to declare null and void the transfer of San Joaquin's assets to Pacific since that transfer was made pursuant to an order of the Railroad Commission and such orders are reviewable only by the Supreme Court. In its judgment of dismissal, the court included a provision purporting to adjudge and decree that the attempted distribution of San Joaquin's assets to its common stockholders by a distribution to Pacific of all of its assets other than cash is, and was, null and void as to the respondents. This provision is surplusage in what is, in practical effect, nothing more than a judgment of dismissal.

It does not appear, however, that the court was attempting to set aside an order of the Railroad Commission or to invade the jurisdiction of the Supreme Court. In declaring this transfer null and void as to the respondents it was merely construing the order of the Railroad Commission and holding that such order had not been complied with. This may be done by a superior court. (*Coast Truck Line* v. *Asbury Truck Co.*, 218 Cal. 337 [23 P. (2d) 513].) The Railroad Commission referred in its opinion to the contract of August 11, 1938, between San Joaquin and Pacific and pointed out that therein San Joaquin agreed to first retire all its minority common stock or to pay the amounts due its minority common stockholders, and thereafter to distribute to Pacific ''as its sole remaining stockholder'' its plants, properties and other assets. The order of the commission specifically authorized the transfer to the Pacific ''in conformity with the provisions'' of the contract of August 11, 1938, and further stated that in granting the application no determination had been made of the value of San Joaquin's properties. It would appear that the order of the commission has never been complied with, as Pacific is not yet the ''sole remaining stockholder'' of San Joaquin. The particular point raised by the appellants is without merit, although the provision in question had no proper place in the judgment for the reasons above suggested.

While we regard the method of distribution of its assets adopted by San Joaquin as not authorized by our law it does not necessarily follow that that corporation is without a remedy. It might go back to the point of divergence and then follow the procedure leading to a final dissolution as

outlined in our statutes. Another possibility is some form of equitable relief under the broad powers suggested in *Jones v. Missouri-Edison Elec. Co., supra,* if the facts developed at a hearing justify such a course and the court considers it necessary and proper. Incidentally, some generous purchaser might be found to take over the common stock of the two dissenting stockholders, thus making possible an adjustment without injury to anyone. In any event, the right of the appellants to invoke the benefits offered by section 403 and to obtain the relief and assistance therein provided for should not be foreclosed on demurrer to their petition.

The judgment is reversed with directions to overrule the demurrers, to allow the respondents to answer, and thereafter to proceed, allowing such amendments as may be necessary or proper, with a hearing and determination of the issues and matters which may be presented.

Marks, J., and Griffin, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied August 20, 1942.