ABRAHAM SHRAGE,

Plaintiff,

CENTRAL HANOVER BANK AND TRUST COMPANY, Executor for Abraham Rosenstein,

Intervening Plaintiff,

vs.

BRIDGEPORT OIL COMPANY, INC.

*New Castle, March 9, 1950.*

*Arthur G. Connolly* and *Januar D. Bove, Jr.,* (*Harry J. Halperin* and *Samuel L. Scholer,* of the firm of Halperin, Natanson & Scholer, of New York City, of counsel), for plaintiff and intervening plaintiff.

*Hugh M. Morris,* of the firm of Morris, Steel, Nichols & Arsht, for defendant.

SEITZ, Vice Chancellor: This is a decision after final hearing in a stockholder's suit attacking the fairness of a plan of dissolution. A preliminary injunction was denied in this matter in an opinion reported *ante p.* 203, 68 *A.* 2d 317.

At the time of dissolution the defendant corporation's assets fell into four groups:

(1)  Interests in oil and gas producing leases, equipment used in connection therewith or allocated thereto, and royalty interests;

(2)  Interest in leases for non-producing or "wildcat acreage";

(3)  Cash and bonds converted into cash; and

(4)  Material and supplies not allocated to producing oil and gas leases; drilling rigs, furniture and fixtures; warehouse building and shop equipment, etc.; cars, trucks and trailers.

Under the plan the property in groups 1, 2, and 3 was to be distributed in kind, while the property in group 4 was to be sold and the proceeds presumably distributed. It is important to note in this case that ninety percent of the defendant's stock is owned by one stockholder, being

Cooperative Refinery Association (hereinafter called "Refinery"). Refinery is in essentially the same business as was the defendant and it was the purchaser at private sale of the group 4 assets. The evidence also shows that Refinery took control of the oil leases and wildcat acreage purely by virtue of its position as ninety percent owner of defendant's interest in such property.

The plan of dissolution provided for distribution in kind except for the group 4 assets which constituted a relatively small part of defendant's assets. The plan gave the small stockholders infinitesimal interests in many leases and wildcat acreage. For each share held a stockholder would receive 1/267,200th interest in each of approximately 115 producing wells and several hundred leases or royalty interests located in about 40 counties in Kansas. From the outset of this case plaintiff has pointed out the unfairness involved in requiring the small shareholder to pay the costs of recording these many fractional interests. Subsequently, the defendant through its officers undertook to obligate itself to pay the costs incident to recording these many small interests. Defendant's action in this respect constitutes an admission that the plan when and as adopted was not fair to the small shareholders. In view of the subsequent discussion it becomes unnecessary to consider the defendant's offer to pay recording costs except to state that defendant will be held to its offer as to those small stockholders who elect to take distribution in kind.

I believe the plan is unfair to the small shareholder for another reason. Under the law applicable to these leases it is quite likely that each holder of a small interest in these leases will be obligated to pay his proportionate part of expenses incident to exploiting such leases. If Refinery as the operator should see fit to exploit these leases, it is possible that it could assess these small interests with their proportionate shares and perhaps take over such interests upon default on the part of such owners. The

mere existence of such a possibility, where no alternative is offered the small shareholder *by the defendant,* casts doubt on the fairness of the plan in this situation.

Other reasons appear to demonstrate how, as a practical matter, distribution in kind may be most unfair to the small shareholder. There are obviously numerous problems of bookkeeping and taxes involved in owning small interests in many properties. Moreover, a small shareholder cannot possibly exercise any substantial supervision over so many scattered interests. No ready competitive market for such small interests was shown to be in existence. The small stockholder bought into a "going" concern. While the majority stockholders have a right to dissolve the corporation, in doing so, they must consider its overall fairness. An unfair plan may not be forced on the small shareholder merely because of its happy tax consequences for the large shareholders.

On the basis of the foregoing findings I conclude that the plan in its non-cash distribution-in-kind aspects was and is unfair to the small shareholder—no alternative being offered.

Defendant suggests that the plan could not legally have provided for an alternative in the form of a cash offer by the defendant to purchase the stock of those who did not care to take distribution in kind. Defendant says this is so because such an offer to be legally fair would have to be made available to all stockholders. Defendant points out that there obviously was not enough cash to effectuate such an offer. Assuming that defendant's legal premise is sound, it does not follow that some plan of dissolution providing for the purchase of stock in lieu of taking distribution in kind could not have been legally adopted. For example, the effectuation of the plan could have been conditioned upon stockholders holding in the aggregate not more than a fixed number of shares electing to sell their shares to the corporation for an appropriate

fair price in lieu of taking distribution in kind. A plan with reverse emphasis could also be devised. Some legal plan providing for the payment of cash in lieu of electing to take the non-cash assets in kind might well have been devised.

Defendant suggests that under *Zimmerman v. Tide Water Assoc. Oil Co.*, 61 *Cal. App.* 2d 585, 143 *P.* 2d 409, the defendant had to distribute its oil properties in kind. It might perhaps be said that if that decision was adopted in this State, the defendant corporation would be required to give all stockholders the *right* to take distribution in kind. However, it does not follow that because it had to give the right it could not, and, under these circumstances, should not provide a fair alternative. It may be noted in passing that the group 4 assets were not distributed in kind under the plan.

The present plan provides only for distribution in kind of its principal assets—no alternative is offered by the defendant. Refinery did offer to purchase defendant's outstanding shares at $12.50 per share, and at the hearing Refinery offered to keep the offer open until a fixed future date. Of course, this offer was not part of the plan and was not defendant's offer. It was patently not a determination by the directors of defendant as such as to the fair value of the stock for that purpose. Consequently, it cannot aid particularly in determining the fairness of the plan as such.

The fact that Refinery was in the same business, owned over ninety percent of the defendant's stock, controlled its directors, and took over the defendant's properties are additional reasons for subjecting the plan to careful scrutiny in testing its fairness.

I conclude that the plan is legally unfair to the small shareholders. What should be done about it?

The plan of dissolution has been filed. Partial cash distribution amounting to approximately $1,000,000.00 has

been made. It may fairly be stated that the defendant's physical assets have been largely assimilated into Refinery's business. Moreover, the original plaintiff in this action was a late-comer on the litigation scene and the intervener was even later. While these factors do not militate against the granting of relief in an appropriate case, they do in this instance help to mold the form of relief to be granted.

Considering all the equities I am not inclined to enjoin the effectuation of the plan absolutely. I believe further effectuation of the plan should be enjoined pending a determination of the appropriate fair value per share of the defendant's stock by a master. It may be that the injunction could be even more limited in operation and still afford full protection to those electing to sell their shares. Counsel may be heard on this point. The per-share value when obtained will be offered by the defendant to the stockholders for a fixed time as an alternative to distribution under the present plan. The offer shall remain open for a reasonable time; such time to be fixed in the order. If the defendant does not elect to have the plan consummated under the conditions here imposed, a permanent injunction will be issued with such ancillary relief as may be necessary to restore the *status quo ante*. If neither alternative is feasible a receiver will be appointed. Defendant's election may be designated in the order to be entered hereon.

Considering the final amount received by the defendant from Refinery for the group 4 assets I am inclined to leave this transaction undisturbed insofar as it is important to those shareholders electing to take distribution in kind.

I am not satisfied that the evidence which I have heard is sufficiently complete to enable me to ascertain the appropriate fair value of the defendant's shares. Much of the evidence introduced by the defendant was used to justify Refinery's offer—not the value of all of defendant's assets for purposes of determining a value for the stock in this situation. Some of the evidence in connection with the

proven oil reserves requires clarification. Certain other assets need to be appraised or substitutionary evidence elicited. The value, if any, of other property needs to be fixed if an appropriate offering price is to be determined, e. g. bad debts, drilling operations, etc. The parties should be able to agree that the master shall consider the testimony already introduced with such supplemental testimony as they see fit to offer or the master requests.

An order accordingly will be entered on notice.